THE PEOPLE *ex rel.* SAMUEL K. SKINNER, Chairman of the Capital Development Board, *et al.*, Plaintiffs-Appellants, v. JAMES M. GRAHAM *et al.*, Defendants-Appellees.

Fourth District No. 4—87—0047

Opinion filed May 19, 1988.

418

420

422

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart and Shawn W. Denney, Solicitors General, and Patricia Rosen, Edward M. Kay, and Rita M. Novak, Assistant Attorneys General, of Chicago, of counsel), for appellants.

McNeela & Griffin, Ltd., of Chicago, and Barber, Segatto, Hoffee, Hines & Edwards, of Springfield (Neal R. Novak, Edward P. McNeela, and Barry O. Hines, of counsel), for appellee Fidelity and Deposit Company of Maryland.

Heyl, Royster, Voelker & Allen, of Springfield (Frederick P. Velde and Adrian E. Harless, of counsel), for appellees James M. Graham, Paul W. O'Shea, August P. Wisnosky, Jr., Graham, O'Shea and Wisnosky, Architects and Planners, Inc., Thomas J. Hyde, Graham, O'Shea and Hyde, Architects, Inc., and James M. Pearl.

Ralph Schroeder and Richard E. Stites, both of Livingston, Barger, Brandt & Schroeder, of Bloomington, for appellee L & L, Inc.

Mohan, Alewelt & Prillaman, of Springfield (Cheryl Ragel Stickel, of counsel), for appellees Evans Construction Company and Aetna Casualty & Surety Company.

D. Kendall Griffith, George B. Gillespie, Eugene C. Menges, and Joshua G. Vincent, all of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, for appellees James R. Ahart, Wayne M. Grierson, Professional Engineers and Planners, and Metal-Air Corporation.

Mark G. Zellmer, of Husch, Eppenberger, Donohue, Cornfield & Feldman, of St. Louis, Missouri, for appellees Louis R. Saur, Thomas J. Eckelman, Hoffman/Saur and Associates, Inc., Saur/Obrock Design Associates, Inc., and Louis R. Saur and Associates, Inc.

JUSTICE KNECHT delivered the opinion of the court:

In this appeal we consider the propriety of the trial court's dismissal of a 15-count complaint seeking damages for defects in the design and construction of the ill-fated Capitol Area Vocational Center (center).

Defendants James Graham, Paul O'Shea, August Wisnosky, and Thomas Hyde are Springfield architects associated with Graham, O'Shea and Wisnosky Architects and Planners, Inc. (now Graham, O'Shea, and Hyde Architects, Inc.). Defendants David Hoffman, Louis Saur, Thomas Eckelman, and William Obrock are St. Louis architects associated with the entities bearing their names. These two principal architectural groups formed a joint venture to provide professional services to the Capital Development Board (Board) in connection with design of the center. Defendant James Pearl was employed by the joint venture architects as project manager.

Defendants James Ahart and Wayne Grierson are engineers and members of Professional Engineers and Planners, a partnership, which was retained by the joint venture architects to advise and render structural and mechanical engineering services in the design of

the structural member, and heating, ventilation, and air-conditioning systems.

Defendant Evans Construction Company (Evans) was the prime contractor. Defendant Aetna Casualty and Surety Company issued a performance bond covering Evans' work. Defendant Metal-Air Corporation (Metal-Air) was a roofing subcontractor hired by Evans.

Defendant L&L, Inc. (L&L), was the heating, ventilation and air-conditioning prime contractor. Defendant Fidelity and Deposit Company of Maryland issued a performance bond covering L&L's work. Defendant EMAC, Inc. (EMAC), was L&L's subcontractor.

Construction began in late 1974 or early 1975. The building was completed and occupied in 1977. It was closed in 1982 because of serious structural defects.

Construction was divided into six components: the structural member system; the heating, ventilation and air-conditioning system; the roofing system; the floor topping system; the exterior wall system; and the site drainage system. Utilizing an experimental design concept involving the incorporation of massive amounts of concrete in the structure, these systems, assisted by computerized control, were to be integrated to produce an energy efficient facility capable of significantly reducing the level of energy required to heat and cool the premises.

Plaintiffs filed their original complaint on December 29, 1982. L&L and EMAC answered the complaint. The remaining defendants moved to dismiss based on the statute of limitations, failure to state a cause of action, and other technical deficiencies. Leave was granted and plaintiffs filed a first-amended complaint on July 8, 1983. In it they alleged they discovered the deficiencies in the design and construction of the center may have been wrongfully caused on May 25, 1982, when the Board received a preliminary report from an independent engineering consultant which advised of extraordinary problems the center was experiencing because of defects in the structural member system.

Counts I, VI and IX alleged breach of the respective contractual obligations of the joint venture architects and engineers, Evans, and L&L. Counts II, III, and IV alleged the tort of "professional" negligence against the joint venture architects and engineers, their agents and consultants, and all individually named defendants. Counts VII, X, XIII, and XV sounded in tort and alleged negligence in the performance of construction duties against Evans, L&L, Metal-Air, and EMAC. Count V alleged fraudulent or, alternatively, negligent misrepresentation against the entire joint venture architect engineering

group. Counts VIII and XI sought recovery on the performance bonds against Aetna and Maryland. Counts XII and XIV alleged a third-party beneficiary breach of contract action against subcontractors EMAC and Metal-Air.

In response to renewed motions to dismiss by all defendants, the trial court dismissed counts II, III, IV, VII, X, XIII, and XV (negligence claims) with prejudice finding plaintiffs were precluded from recovery in tort for purely economic loss under the authority of *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443. Count V (fraudulent or negligent misrepresentation) was dismissed with leave to amend because multiple causes of action were pleaded. Counts XII and XIV (third-party beneficiary claims) were dismissed as conclusory with leave to amend. Counts VIII and XI (surety claims) were dismissed with prejudice on the theory the performance bonds did not obligate the sureties when the basis for recovery was not the failure of the contractor to complete the work but was, instead, an allegation the work was not of acceptable quality. Finally, defendants' motions to dismiss counts I, VI, and IX (primary breach of contract claims), which were predicated on the running of the statute of limitations, were denied because the court found a question of fact existed as to when plaintiffs discovered they had a cause of action.

Plaintiffs were granted leave to file the first amendment to the amended complaint on August 16, 1984, which divided count V into amended counts Va through Vi and alleged fraudulent misrepresentation. Previous references to negligent misrepresentation were eliminated.

A second amendment to the amended complaint was filed on October 18, 1984, realleging counts XII and XIV (third-party beneficiary claims). The new counts alleged the subcontractors fraudulently concealed the defective nature of the work they performed. Motions to dismiss were filed with respect to each amendment. The trial court granted the motions on counts Vd through Vi on July 19, 1985. Counts XII and XIV were again dismissed on November 13, 1986, and August 22, 1985, respectively.

On July 19, 1985, the court allowed plaintiffs' motion to file amendments to counts I, VI, and IX, expressly ruling all previous versions of those counts were abandoned. As amended, the contract counts added allegations of fraudulent concealment and misrepresentation by the architect and engineer group. On November 26, 1985, the court struck counts I, VI, IX, and Va through Vc. On plaintiffs' motion to reconsider, the court allowed plaintiffs 60 days to amend

counts I, VI, and IX on February 19, 1986.

Counts VIII and XI (performance bond claims) were never amended or refiled although the original order of dismissal granted plaintiffs leave to do so.

No amendment consistent with the court's February 1986 ruling was filed and various defendants subsequently filed motions for final judgment. Plaintiffs filed a motion for substitution of counsel and a motion requesting an additional 60 days in which to file an amended complaint as to all parties and all theories of recovery, or, in the alternative, an extension for 30 days to file a motion to reconsider the dismissal of all original and amended counts because the new attorney assigned to the case had not yet familiarized himself with the pleadings and documentation.

The trial court denied plaintiffs' motion for further extensions and dismissed plaintiffs' action in its entirety with prejudice on December 18, 1986.

■■ Initially we consider the question of whether the statute of limitations contained in section 13—214 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1983, ch. 110, par. 13—214) applies to the plaintiff Capital Development Board. The version of the statute in effect at the time the original complaint was filed states in pertinent part:

> "As used in this Section 'person' means any individual, any business or legal entity, or any *body politic*.
>
> (a) Actions based upon tort, contract or otherwise against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property shall be commenced within 2 years from the time the person bringing an action, or his or her privity, knew or should reasonably have known of such act or omission.
>
> * * *
>
> (e) The limitations of this Section shall not apply to causes of action arising out of fraudulent misrepresentations or to fraudulent concealment of causes of action." (Emphasis added.)
> Ill. Rev. Stat. 1983, ch. 110, par. 13—214.

See also Ill. Rev. Stat. 1983, ch. 110, par. 13—215 (applicable to fraudulent concealment).

Plaintiffs argue the definition of "person" which includes "any body politic" does not include the State or its agencies. We disagree. In *People ex rel. Skinner v. Hellmuth, Obata & Kassabaum, Inc.* (1985), 135 Ill. App. 3d 765, 482 N.E.2d 155, *rev'd on other grounds*

(1986), 114 Ill. 2d 252, 500 N.E.2d 34, a similar argument was rejected by the appellate court. There, it was succinctly stated:

"It is established that the State and its agencies, when in pursuit of public rights, are not barred by a statute of limitations unless specifically included within the terms of the statute. There is a policy to preserve public rights, revenues and property from loss due to the negligence of public officers. [Citations.] [The Capital Development Board] argues that if the legislature had intended this statute to apply to the State it would have expressly made reference to the State of Illinois, as it has done in other sections of the Code of Civil Procedure (see Ill. Rev. Stat. 1983, ch. 110, pars. 2—611 and 13—121), and did not do so here.

Words used in a statute are the best source of legislative intent and, absent some contrary indication, they will be given their plain and ordinary meaning. [Citation.] Section 13—214 states, *inter alia*, that it is applicable to 'any body politic.' In *People v. Snyder* (1917), 279 Ill. 435, 440-41, 117 N.E. 119, the court determined that the term 'body politic' denotes a politically organized, collective body of a nation or state and that the State of Illinois was such a body. [Citation.]

We conclude the legislature intended by its terms to include the State of Illinois and its agency, CDB, within the scope of section 13—214(a)." *(Skinner,* 135 Ill. App. 3d at 767-68, 482 N.E.2d at 157.)

(Accord *People ex rel. Skinner v. FGM, Inc.* (1988), 166 Ill. App. 3d 802, 520 N.E.2d 1024.) Further support for this reasoning is found in *Electrical Contractors Association v. Illinois Building Authority* (1966), 33 Ill. 2d 587, 213 N.E.2d 761, in which the supreme court stated the Illinois Building Authority, statutory predecessor to the Board (Ill. Rev. Stat. 1985, ch. 127, par. 780.01A(a)), was a body politic and corporate of the State. Moreover, the Capital Development Board Act (Ill. Rev. Stat. 1985, ch. 127, par. 773) expressly states the Illinois Building Authority is a body politic within this State. In addition, in *County of Du Page v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 485 N.E.2d 1076, the supreme court stated it was clear the definition of "person" contained in section 13—214 of the Code "expressly includes governmental entities." We conclude the Board is subject to the limitation embodied in section 13—214 of the Code.

Plaintiffs' reliance on *City of Shelbyville v. Shelbyville Restorium, Inc.* (1983), 96 Ill. 2d 457, 451 N.E.2d 874, is misplaced. While that

case held a State's limitations immunity will be applied when the action involves "public rights," the statute involved in *Shelbyville* did not include "bodies politic" within its terms. As such, the case only restates the common law rule and has no application.

The limitations statute also applies to the Riverton School District (district) because section 10—2 of the School Code provides that directors of each school district "shall be a body politic and corporate" of the State of Illinois and may sue and be sued in all courts of the State. Ill. Rev. Stat. 1985, ch. 122, par. 10—2; see also *Hinkley-Big Rock School District v. Sugar Grove* (1982), 105 Ill. App. 3d 959, 435 N.E.2d 216.

■ Plaintiffs next contend their complaint is not barred by the two-year statute of limitations because the complaint raises a factual issue under the "discovery rule" as to when the cause of action accrued. Plaintiffs allege they only discovered their cause of action on May 25,. 1982, the date they received the independent engineering report detailing instances of structural failure.

Application of the discovery rule is governed by the principles set forth in *Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 430 N.E.2d 976, in which the supreme court formulated the following standard:

> "At some point the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. At that point, under the discovery rule, the running of the limitations period commences." (*Knox*, 88 Ill. 2d at 416, 430 N.E.2d at 980-81.)

While usually a question of fact (*Knox*, 88 Ill. 2d 407, 430 N.E.2d 976), when it is apparent from the undisputed facts only one conclusion can be drawn, the question becomes one for the court. *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 156, 421 N.E.2d 869, 874.

■ In applying the standard, the court in *Knox* stated the triggering event is not the first knowledge the injured person has of an injury nor is it the acquisition of knowledge that one has a cause of action against another for an injury suffered. Rather, the statute begins to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused. (*Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 421 N.E.2d 864; *Witherell*, 85 Ill. 2d 146, 421 N.E.2d 869.) The term "wrongfully caused" does not connote that one have actual knowledge of negligent conduct or knowledge of the existence of a cause of action before the statute may be triggered. Rather, at some point the

injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. *Knox*, 88 Ill. 2d at 416, 430 N.E.2d at 980; *Nolan*, 85 Ill. 2d at 171, 421 N.E.2d at 868; *Witherell*, 85 Ill. 2d at 156, 421 N.E.2d at 874.

As noted at the outset, design and construction involved six interrelated but distinct component systems. An extended recitation of the multifarious allegations of design and construction defects would unduly lengthen this opinion and serve no useful purpose. We therefore describe, in summary fashion, the problems which developed and the evidence which bears on the question of when plaintiffs knew or reasonably should have known of their injury and its wrongful cause.

From the onset of construction significant problems were identified in each system.

(1) The Structural Member System:

As early as November 1976 serious concerns were expressed about cracking, spalling, movement, and general deterioration of the concrete beams and support columns of the building. By December 1977 the Board demanded "immediate attention" to the situation because certain concrete beams were "showing evidence of structural distress." Owing to movement of the concrete structures, cracks and deterioration, reinforcement and shoring of the concrete beams were required. Ongoing efforts to determine the cause of these conditions and effect repairs were unsuccessful. By June 11, 1979, the district petitioned, by resolution, the director of the Board "to take whatever actions are necessary" to insure the immediate completion of a quality facility "of an acceptable standard to assure that tax monies have been defensibly expended." The resolution further expressly recited these problems had been "evident since substantial completion [of the facility] nearly two (2) years hence." A memorandum attached to the resolution dated June 13, 1979, informed the Board of the district's "intention to present a request for *authorization to litigate* *** at the September Board Meeting."

(2) The Heating, Ventilation, and Air-Conditioning System:

The experimental system never functioned properly. Certain areas of the facility were not sufficiently heated while others were too warm. The computer installed to regulate the system did not perform properly. Certain physical equipment, such as fresh-air dampers, operated "in a manner exactly opposite to their intended purpose." Temperature controls did not work. Other mechanical failures were numerous. Minutes from a meeting held on May 5, 1978, reflect the director of the center expressed the belief "the school has grounds for

a lawsuit."

(3) The Roofing System:

Defects were noted as early as April 1977. Among the problems identified were stress lines in the flashings, ponding water, separation of the top coating from the rubber sheet membrane, blisters in the membrane, depression and separation of insulation, and continuing leakage. Expansion joints did not function properly and control joints split. The manufacturer refused to bond the roof in 1978. A roofing specialist informed the Board in May 1979 the total roof system deficiencies were a function of omissions and errors on the part of the architect. In July 1980 the subcontractor refused to continue making repairs without a bond. In August 1980 the manufacturer opined the roof was "terrible" and "not acceptable."

(4) The Floor Topping System:

Cracking and deterioration of concrete slab floors were noted as early as November 1976 when a systematic analysis of the entire lower level of the structure was requested by the center director. Cracks and spalling in a concrete floor slab over a laboratory were noted. By June 1978 the floors appeared to be "delaminating" and "disintegrating." The floor defects were also the subject of the Board resolution of June 11, 1979, when the Board indicated it would seek to pursue legal action.

(5) The Exterior Wall System:

The exterior wall covering applied did not meet contract specifications. It also was not properly bonded to the underlying plywood surface and leaked continuously. In March 1977 a Board letter to the architect stated the exterior structure was "strictly an inferior design problem." On August 4, 1977, the exterior, as then constructed, was rejected as not being watertight and not in conformity with the contract. By letter of June 27, 1979, counsel for the Board threatened "legal action" with respect to the siding problem.

(6) The Site Drainage System:

Water on the site did not drain to the side or away from the building. Instead, it accumulated near or even in the building itself. Water also pooled on driveways and at gate areas. Runoff from an adjacent community college further aggravated the situation. By May 1978 the Board was aware of an opinion the site drainage problem was due to "poor design" of headwalls. This matter was also included in the district's resolution of June 11, 1979.

■ This brief summary is but a shadow of the numerous imperfections of which plaintiffs were intimately aware from the inception of the project. Despite attempted repair and assurances of sound de-

sign and construction, plaintiffs knew of the failure to repair certain defects and the irremediable condition of others. Moreover, in each case, the plaintiffs advised defendants no later than June 1979 legal action would be taken. It cannot reasonably be said a question of fact exists on the issue of discovery. The two-year statute of limitations began to run well before 1982 and certainly no later than 1979.

We also reject plaintiffs' contention the two-year limitations period in section 13—214(a) should not be applied retroactively to bar the cause of action. The legislative history surrounding the amendments to section 13—214 is concisely stated in *Champaign County Nursing Home v. Petry Roofing, Inc.* (1983), 117 Ill. App. 3d 76, 78, 452 N.E.2d 847, 849, and need not be reproduced here. Based on the history of the legislation, this court held the legislature intended that the repeal of the savings clause to section 13—214(a) have retroactive effect. (Accord *DeSeve v. Ladd Enterprises, Inc.* (1985), 137 Ill. App. 3d 796, 484 N.E.2d 1220; *Matayka v. Melia* (1983), 119 Ill. App. 3d 221, 456 N.E.2d 353.) However, this court also recognized that when a statute of limitations which shortens the period in which to bring an action is enacted without a savings clause, justice requires that the owner of a cause of action which is barred by the current statute be afforded a reasonable time after its effective date in which to bring his action. *Champaign County Nursing Home*, 117 Ill. App. 3d at 80, 452 N.E.2d at 850.

In determining what constitutes a reasonable amount of time the supreme court has stated:

"The period which is scrutinized by the courts for its reasonableness is that time between the statute's effective date and the date on which the preexisting cause of action would be barred under the new statute as applied." *Moore v. Jackson Park Hospital* (1983), 95 Ill. 2d 223, 233, 447 N.E.2d 408, 412, citing *Hupp v. Gray* (1978), 73 Ill. 2d 78, 83, 382 N.E.2d 1211, 1213, and *Balzer v. Inland Steel Co.* (1981), 100 Ill. App. 3d 1071, 1072-73, 427 N.E.2d 999, 1000.

Plaintiffs concede they filed their original action on December 29, 1982, or 1 year, 3 months, and 13 days after the effective date of the amendment which repealed the savings clause. Other courts in examining the issue of what constitutes a reasonable time have determined much shorter periods between the effective date of the amendment and the filing of the lawsuit were unreasonable. Compare *Champaign County Nursing Home*, 117 Ill. App. 3d 76, 452 N.E.2d 847 (seven months); *DeSeve*, 137 Ill. App. 3d 796, 484 N.E.2d 1220 (17 months); *Matayka*, 119 Ill. App. 3d 221, 456 N.E.2d 353 (nine months).

Plaintiffs argue, however, they should be granted a two-year period of time following repeal of the savings clause because the 12-year statute of repose codified in section 13—214(b) of the Code (Ill. Rev. Stat. 1983, ch. 110, par. 13—214(b)) has not expired. Plaintiffs reason that since the statute of repose affords them leave to file an action within two years from the time of discovery, if discovery occurs within 12 years from commission of the act or omission giving rise to the injury, they should be allowed two years from the repeal of the savings clause because they are within 12 years from the original date of construction. This argument misses the mark.

The running of a statute of repose extinguishes not only a party's remedy but the right to pursue an action by cutting off the right of action without regard to its accrual. In contrast, a statute of limitations only nullifies a party's remedy. Just as a statute will not be retroactively applied to automatically deprive a party of a remedy when a limitations period is shortened, neither will it be applied when the cause of action is instantaneously barred because the statute of repose has run. In either case, the fundamental question is whether plaintiffs filed their cause of action within a reasonable time after the amendment. Fixing a two-year limit simply because the statute of repose has not run is arbitrary. Such a policy ignores the crucial issue of discovery of the cause of action and, in effect, would operate as a new two-year statute of limitations without regard to plaintiff's diligence in attempting to prosecute within a reasonable time after the amendment to the statute took effect.

Plaintiffs also contend defendants should be estopped from relying upon the statute of limitations because of their conduct. With respect to counts II, III, IV, VIII, X, XIII, and XV, which sounded in tort and alleged negligence against the various defendants, this argument is not well taken. A party seeking to assert estoppel to bar a claim or defense must plead it. Where it is not pleaded, it cannot be invoked. (Ill. Rev. Stat. 1985, ch. 110, par. 2—613(d); *Johnson v. Johnson* (1975), 26 Ill. App. 3d 64, 324 N.E.2d 450.) In none of the negligence counts did plaintiffs plead estoppel and, in the absence of such pleading, they may not now raise the issue for the first time on appeal. In view of the foregoing, we conclude the statute of limitations applies to bar each of the negligence counts.

Quite apart from the limitations question, independent grounds exist for dismissing counts II, III, IV, VII, X, XIII, and XV of the complaint on the basis of *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443, which held that economic loss alone cannot serve as a basis for recovery in tort.

These counts allege the joint venture architects and engineers, the individual architects, the professional engineers and planners partnership, the individual engineers, and the prime and subcontractors were negligent in performing their respective professional duties which resulted in economic loss and consequential property damage. Recovery was sought for the present and future cost of hiring consultants to determine the nature and extent of the defects as well as the cost of repairing those defects.

In *Moorman* the supreme court established that contract law, as opposed to tort law, provides the most appropriate remedy for individuals suffering "economic losses." The court defined economic loss as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property," as well as "the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." (*Moorman*, 91 Ill. 2d at 82, 435 N.E.2d at 449.) These economic losses, or damages resulting from qualitative defects in the product, are not recoverable in tort because a buyer's loss of the benefit of his bargain is not an interest tort law traditionally protects. (*Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 441 N.E.2d 324.) The relevant inquiry is whether the damages alleged are "physical harm or property damage" recoverable in tort or nonrecoverable economic losses. (*Bi-Petro Refining Co. v. Hartness Painting, Inc.* (1983), 120 Ill. App. 3d 556, 458 N.E.2d 209.) Here the alleged damages are purely economic and *Moorman* would bar their recovery in tort.

Plaintiffs argue, however, we should recognize an exception to *Moorman* because the alleged defects in the building were extensive and the risk of injury from collapse of the structure enormous. Plaintiffs maintain this risk provides justification for a suit in tort. However, as subsequent supreme court decisions made clear, a plaintiff must demonstrate actual harm above and beyond disappointed expectations. (*Redarowicz*, 92 Ill. 2d 171, 441 N.E.2d 324; *Foxcroft Townhome Owners Association v. Hoffman Rosner Corp.* (1983), 96 Ill. 2d 150, 449 N.E.2d 125.) In those cases recovery in tort was denied for defective construction of a building in the absence of allegations of personal injury, other property damage, or damage resulting from a sudden and dangerous occurrence. As the supreme court most recently stated, "[w]here the construction defects do not cause physical injuries or damage to other property, we are unwilling to impose tort liability on a builder for breach of his contract with the pur-

chaser, even if the breach was wilful and wanton." (*Morrow v. L. A. Goldschmidt Associates, Inc.* (1986), 112 Ill. 2d 87, 98, 492 N.E.2d 181, 185.) The trial court properly dismissed counts VII, X, XIII, and XV under the authority of *Moorman.*

 Plaintiffs maintain counts II, III, and IV against the architects and engineers should stand, nonetheless, as counts alleging negligent performance of professional duties to which the *Moorman* doctrine does not apply. In *Rosos Litho Supply Corp. v. Hansen* (1984), 123 Ill. App. 3d 290, 462 N.E.2d 566, an owner sued his contractors and an architect for negligence. The *Rosos* court held plaintiff could sue the architect in tort, despite privity, because architects hold themselves out to the public as experts and have traditionally been subject to malpractice suits like any other professional. Refusing to apply *Moorman* the court distinguished between rendering professional services and qualitatively defective products. Applying the *Moorman* bar to recovery, the court felt, would eliminate an entire established body of malpractice law. (See also *People ex rel. Skinner v. FGM, Inc.* (1988), 166 Ill. App. 3d 802, 520 N.E.2d 1024.) The *Rosos* court also found significant the fact the owner lacked a warranty remedy against the architect even though in privity with the architect.

This court has previously declined to embrace the distinction relied upon by the *Rosos* court in determining when an economic loss may be recovered in tort. In *Anderson Electric, Inc. v. Ledbetter Erection Corp.* (1985), 133 Ill. App. 3d 844, 847, 479 N.E.2d 476, 479, this court stated:

> "The *Moorman* court was dealing with products rather than with services, but we perceive no reason why the same rationale should not apply. Plaintiff makes no claim for personal injury or property damage; it seeks only recovery of the additional cost of redoing portions of the project; there is no allegation of a sudden calamitous event, only dissatisfaction with the quality of assistance received from [defendant]."

We adhere to this rationale and find the relevant inquiry to be the type of loss sustained, not the nature of the relationship giving rise to the damage. It is also clear the lack of an alternative remedy is of no consequence. The supreme court stated in its decision affirming *Anderson*: "A plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract." (*Anderson Electric, Inc. v. Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146, 153, 503 N.E.2d 246, 249; accord *Palatine National Bank v. Charles W. Greengard Associates, Inc.* (1983), 119 Ill.

App. 3d 376, 456 N.E.2d 635 (which held *Moorman* barred an action against design professionals for inadequate design of a water drainage system and landscape grading when the only defect complained of was the system did not function as intended and lost profits were sought).) We do not perceive *Moorman* has carved out an exception for professionals. (See *Bates & Rogers Construction Corp. v. North Shore Sanitary District* (1984), 128 Ill. App. 3d 962, 471 N.E.2d 915 (Reinhard, J., specially concurring), *aff'd on other grounds* (1985), 109 Ill. 2d 225, 486 N.E.2d 902.) To so hold would unduly circumscribe *Moorman* when plaintiffs sue in tort for negligent performance of professional services when the real injuries relate primarily to a product which does not meet plaintiffs' expectations. Counts II, III, and IV were properly dismissed.

We next consider counts I, VI, and IX of the third-amended complaint against the joint venture architects and engineers, Evans, and L&L. Initially, plaintiffs maintain they have not waived counts I, VI, and IX as originally pleaded in the first-amended complaint. This argument is premised upon a "recital" in the third-amended complaint to the effect that nothing in it was intended to modify or waive any rights of plaintiffs to appeal from the court's rulings with respect to the counts previously dismissed. Plaintiffs maintain this is sufficient to show an intent not to abandon the original counts. Under the majority holding in *Foxcroft*, the rule is that allegations in former complaints, not incorporated in the final amended complaint, are deemed waived. We believe a mere recital that one does not forego certain rights by repleading is not sufficient, of itself, to avoid abandonment of a prior pleading. Moreover, even were we to embrace the rationale adopted by the dissent in *Foxcroft*, that pleading over is not a waiver when the plaintiffs have manifested a clear intention to continue reliance on their initial claim (*Foxcroft*, 96 Ill. 2d at 157, 449 N.E.2d at 128 (Simon, J., dissenting)), plaintiffs cannot prevail because, as we have previously determined, the two-year statute of limitations operates to bar the claims. Although plaintiffs again argue defendants ought to be estopped from relying on the two-year statute of limitations, nowhere in counts I, VI, or IX of the first-amended complaints is a theory of estoppel pleaded upon which plaintiffs may now rely.

Turning to the third-amended complaint we consider counts I and VI. Both counts restate the identical allegations contained in the first-amended complaint. In count I, for instance, 97 separate incidents are cited as alleged examples of breach of the contractual duties and obligations of the architect engineer group. Count VI contains 44 such al-

legations against the prime contractor. In addition, in the third-amended complaint plaintiffs set forth a number of specific instances in which various defendants made specific statements which plaintiffs allege were "known by the defendants *** to be substantially false and to constitute fraudulent misrepresentations or fraudulent concealment" as to the quality and adequacy of the design of the vocational center structural member system. Plaintiffs thereafter allege these statements, upon which they reasonably relied, were made for the purpose of and with the intent of deceiving and defrauding plaintiffs and prevented them either from discovering the actual nature and severity of the defects in the design or construction of the system and the defective products or materials used, or caused plaintiffs to forego or delay in enforcing their legal rights to bring and prosecute causes of action for these defects.

It is readily apparent plaintiffs attempted to replead these counts to avoid the bar of the two-year statute of limitations. Nevertheless, in so doing, they have run afoul of basic civil procedure by alleging more than one cause of action in a single count. (Ill. Rev. Stat. 1985, ch. 110, par. 2—603.) There is a distinct difference between alleging fraudulent concealment of a cause of action, which requires affirmative acts which are calculated to prevent the discovery of a cause of action (*Chicago Park District v. Kenroy, Inc.* (1980), 78 Ill. 2d 555, 402 N.E.2d 181), and alleging fraudulent misrepresentation, which requires that a plaintiff reasonably rely upon intentional misrepresentation to his detriment. (*Rozny v. Marnul* (1969), 43 Ill. 2d 54, 250 N.E.2d 656.) In the former case, fraudulent concealment can be pleaded, not as a separate cause of action, but as an alternative ground to permit an otherwise time-barred contract claim to proceed. Were this the gist of the pleading, section 13—215 of the Code would apply. On the other hand, fraudulent misrepresentation is a separate tort governed by the statute of limitations in section 13—205 of the Code. (Ill. Rev. Stat. 1985, ch. 110, par. 13—205.) Since contractual relationships may give rise to actions for breach of contract or actions in tort they must be set out in separate counts. (*Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 430 N.E.2d 976.) Because of this defect, counts I and VI were properly dismissed.

Count IX of the complaint alleging fraudulent concealment against L&L is also fatally defective. The count alleges the subcontractor, EMAC, made two false representations to the Board concerning the quality of construction of the heating, ventilation, and air-conditioning system. The count then alleges L&L fraudulently concealed from plaintiffs the fact these statements were substantially false be-

cause L&L feared the Board would learn of the defective workmanship had it the knowledge these statements were false. As we have indicated, fraudulent concealment requires acts which are calculated to prevent the discovery of a cause of action. Mere silence by the defendant, accompanied by the failure of the plaintiff to discover the cause of action, is not sufficient to toll the limitations period. (*Kenroy*, 78 Ill. 2d 555, 402 N.E.2d 181.) Having failed to allege L&L performed any affirmative acts, plaintiffs are not entitled to the benefit of the extended statute of limitations contained in section 13—215. Count IX is therefore barred.

Our view that counts I and VI cannot stand because they plead more than one cause of action in violation of section 2—603 of the Code (Ill. Rev. Stat. 1985, ch. 110, par. 2—603) is reinforced by examination of amended counts Va through Vi. As originally filed, count V alleged both negligent and fraudulent misrepresentation. As amended, count V was divided into nine separate sections against the individual architects, engineers, the two architectural firms, and the project manager of the joint venture. The specific instances of alleged misconduct in the design and construction of the facility as well as the alleged misrepresentations made by various individuals are virtually identical to those contained in counts I and VI. Yet, the amended count V pleadings purport to raise a theory of fraud or fraudulent misrepresentation. In all but count Vf it is alleged defendant either misrepresented the severity of the defects or fraudulently concealed from plaintiffs the cause of action.

■■ Not only is it improper to intermingle theories or causes of action in a single count, the practice of restating identical facts in multiple counts differentiated only by the caption of the count which purportedly identifies one of the various theories some of the allegations support is to be discouraged. Defendants are not required to guess at what they are being called upon to defend.

■■ Only count Vf deviates from the pattern by alleging only that James Pearl, project manager for the joint venture architect engineers, made a fraudulent misrepresentation which prevented plaintiffs from discovering the actual nature of the defects in the design and construction of the center. In examining the count, we conclude, however, it fails to state a cause of action as a matter of law. The alleged misrepresentation made by Pearl was to the joint venture architects and concerned the number of days he was physically present on the jobsite. The count then alleges the joint venture architect engineers knew the statement was a misrepresentation but, nevertheless, in turn, misrepresented to plaintiffs that Pearl spent more time on

the jobsite than he actually did. As a matter of logic and law plaintiffs cannot have been damaged by the statement made by Pearl to the joint venture because, as alleged, the joint venture was aware of the falsity of the statement by Pearl. Any theoretical injury which may have occurred to plaintiffs can only be attributed to the joint venture, which passed on this misrepresentation, knowing it to be a misrepresentation. Counts Va through Vi were properly dismissed.

██ █ Plaintiffs also contend the trial court erred in striking counts XII and XIV against EMAC and Metal-Air. Those counts allege the Board was a third-party beneficiary of the contracts between the respective subcontractors and prime contractors. It is well settled in Illinois that only when parties intentionally enter into a contract for the direct benefit of a third party may that person, who is not a party to the contract, enforce any rights therein. (*Carson Pirie Scott & Co. v. Parrett* (1931), 346 Ill. 252, 257, 178 N.E. 498, 501.) The test is whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract. (*Parrett*, 346 Ill. at 257, 178 N.E. at 501.) The outcome of each case depends upon the intention of the parties as that intention is to be gleaned from a consideration of the contract and the circumstances surrounding the parties at the time of its execution. (*People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.* (1980), 78 Ill. 2d 381, 385, 400 N.E.2d 918, 919.) The promisor's intention must be evidenced by an express provision in the contract identifying the third-party beneficiary. *Resnik*, 78 Ill. 2d at 385, 400 N.E.2d at 918.

██ In this case these two counts were included in the original complaint, and repleaded in the amended complaint, and the second-amended amendment to the complaint. At no point were the contracts between the prime and subcontractors attached, although plaintiffs had four years to secure them through discovery. In the absence of the contracts, it is virtually impossible to determine the intent of the parties. Moreover, the two counts allege only that the subcontractors knew the primary beneficiary of their contracts was the Board and pursuant to that knowledge the subcontractors had a duty to perform their obligations for the benefit of the Board. We deem these allegations to be insufficient. It is not enough that the parties to the contract know, expect or even intend that others would benefit from the construction of the building. The contract must be undertaken for the plaintiff's direct benefit, and the contract itself must affirmatively make this intention clear. (*Waterford Condominium Association v. Dunbar Corp.* (1982), 104 Ill. App. 3d 371, 432 N.E.2d 1009; *Midwest Concrete Products Co. v. La Salle National Bank* (1981), 94 Ill. App.

3d 394, 418 N.E.2d 988.) In the absence of the contracts, plaintiffs' allegations are conclusory and counts XII and XIV were properly dismissed.

Plaintiffs also contend the trial court improperly dismissed counts XIII and XI against the sureties Aetna and Maryland. Based on section 1 of "An Act in relation to bonds of contractors ***" (Bond Act) (Ill. Rev. Stat. 1985, ch. 29, par. 15), plaintiffs argue the surety is liable for the contractor's breach of contract. In *Board of Education v. Hartford Accident & Indemnity Co.* (1987), 152 Ill. App. 3d 745, 504 N.E.2d 1000, it was stated section 1 of the Bond Act imposes a statutory obligation on a surety of a construction bond to ensure or guarantee that all the terms, conditions, covenants, undertakings, and agreements of the construction contract will be performed and completed and to satisfy all just claims due under the construction contract. In essence, the law requires that all the obligations placed on the contractor by the terms of the contract must be undertaken and completed by a surety of the bond in the event the contractor cannot or does not complete its obligations under the contract. (*Board of Education*, 152 Ill. App. 3d at 749, 504 N.E.2d at 1003.) This obligation extends to defective work, not merely completion of the work (*Board of Education*, 152 Ill. App. 3d 745, 504 N.E.2d 1000), since the obligation of the surety on a performance bond coextends with the obligations of the contractor on the underlying construction contract. *Robinhorne Construction Corp. v. Snyder* (1969), 113 Ill. App. 2d 288, 251 N.E.2d 641, *aff'd* (1970), 47 Ill. 2d 349, 265 N.E.2d 670.

Defendants counter that the surety claims were time barred or improperly pleaded. We note the time limitation arguments now being raised were not relied upon in the trial court as these counts were dismissed on other grounds. Nevertheless, we consider them here since an appellee is free to urge any point in support of judgment on appeal even though it may not have been ruled upon directly by the trial court, so long as a factual basis for such point was before the trial court. *Shaw v. Lorenz* (1969), 42 Ill. 2d 246, 246 N.E.2d 285.

It is clear a surety on a performance bond may not avoid liability on the sole basis a statute of limitations has barred an action against the principal (*People ex rel. Skinner v. Hellmuth, Obata & Kassabaum, Inc.* (1986), 114 Ill. 2d 252, 500 N.E.2d 34), and actions based upon bonds are normally subject to a 10-year statute of limitations (Ill. Rev. Stat. 1985, ch. 110, par. 13—206; *Skinner*, 114 Ill. 2d 252, 500 N.E.2d 34). However, the parties may, by contract, limit the time in which a party may file an action on a bond. *Board of Educa-*

*tion,* 152 Ill. App. 3d at 750, 504 N.E.2d at 1004.

In this case, a contractual limitation on actions on the performance bonds was entered. The contract provides:

> "9.7.5 The making of final payment shall constitute a waiver of all claims by the Owner except those arising from:
>
> > .1 unsettled liens,
> >
> > .2 faulty or defective Work appearing after Substantial Completion,
> >
> > .3 failure of the Work to comply with the requirements of the Contract Document, or
> >
> > .4 terms of any special guarantees required by the Contract Documents.
>
> * * *
>
> 7.5.2 The life of the Bonds and the Guarantee of the building shall extend twelve months beyond the day on which final payment under the contract falls due, or the date on which Owner starts occupancy, whichever comes first.
>
> 7.5.3 If, before the expiration of the twelve month Guarantee period, a Contractor has been notified by the Owner or Architect regarding any work to be completed or corrected; any unpaid bills presented to the Owner; or any other unfinished business, the expiration of the twelve month period dues [*sic*] not relieve the Contractor or his bondsmen of the proper execution of such items."

Plaintiffs argue the "guarantee period" expressed in the contract never ran because the record demonstrates that within 12 months from final payment or occupancy both Evans and L&L were notified of certain work that needed to be corrected. Plaintiffs point to the minutes of various meetings and other correspondence which address a variety of problems which remained unresolved after the facility was occupied.

■■ However, it must be noted neither count XIII nor count XI makes any reference to the fact of notification within the 12-month period, nor do these counts specify which particular defects were the subject of notification. Absent these allegations the complaints against the sureties are fatally defective. The liability of the surety under the express terms of the contract is extinguished 12 months after final payment or occupancy except, and only to the extent the contractor is notified of unfinished or defective work in need of correction. Absent specificity as to which defects remained and were specifically reported to the contractors within the 12-month period, the sureties cannot determine the extent of their potential liability since they do not know

which aspects of the construction they are being called upon to defend. Since the counts fail to specify the particular defects for which notice was given within the applicable time period extending the guarantee, counts XIII and XI were properly dismissed.

■■ Finally, the Board argues the trial court abused its discretion in refusing to grant an additional extension of time to file an amended complaint. We disagree. At the time the trial court dismissed the case, the litigation had already consumed four years. The original complaint and three subsequent amendments were filed and on February 19, 1986, 60 days' leave was given to file yet another amended complaint. Plaintiffs' next request for an extension of time was filed only in response to motions for final judgment brought after plaintiffs failed to file anything within the 60-day period previously granted by the trial court. The decision of the trial court to permit an amendment to a complaint is a matter of sound judicial discretion. (*Lehman v. Stephens* (1986), 148 Ill. App. 3d 538, 499 N.E.2d 103.) A motion to amend should normally include a proposed amendment, or otherwise indicate additional facts the amendment would show. No proposed amendment was attached to plaintiffs' last request for an extension and the only facts urged in support of the motion were that a new assistant Attorney General had taken over the case several months earlier. This fact, standing alone, is not sufficient to warrant a further extension of time since there can be no presumption a proposed amendment will be proper when it is not presented and when there are no means of determining whether it will be sufficient. (*Intini v. Schwartz* (1979), 78 Ill. App. 3d 575, 397 N.E.2d 84.) Having failed to present an amended pleading or indicate how it would cure defects in the original complaint, we conclude the trial court did not abuse its discretion in denying plaintiffs further time to file additional amendments.

For the foregoing reasons, the judgment of the circuit court of Sangamon County is affirmed.

Affirmed.

LUND and SPITZ, JJ., concur.