SARA KIRKSEY, Plaintiff-Appellant, v. RICHARD C. TREFZGER, Defendant-Appellee.

Fourth District   No. 4—88—0242

Opinion filed October 26, 1988.

Jeffrey B. Rock, of Harvey & Stuckel, Chartered, of Peoria, for appellant.

Costigan & Wollrab, P.C., of Bloomington (Robert W. Neirynck, of counsel), for appellee.

JUSTICE LUND delivered the opinion of the court:

Plaintiff Sara Kirksey filed a medical malpractice action against defendants Richard Trefzger, M.D., and Mennonite Hospital. Mennonite Hospital moved for summary judgment, which was granted by the circuit court. We affirmed that ruling on appeal. (*Reynolds v. Mennonite Hospital* (1988), 168 Ill. App. 3d 575, 522 N.E.2d 827.) Subsequently, Trefzger, the remaining defendant, moved for summary judgment alleging the cause of action against him was barred by section 13—212 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1987, ch. 110, par. 13—212). The circuit court of McLean County granted the motion and entered summary judgment in favor of defendant. Plaintiff appeals. We reverse and remand.

Plaintiff raises only one issue on appeal: whether the trial court erred in granting summary judgment for defendant. Defendant adds an additional question regarding the sufficiency of the allegation in plaintiff's complaint invoking the discovery rule. The record contains only the pleadings and plaintiff's discovery deposition. A summary of these documents follows.

In 1980, plaintiff was employed as a factory worker by the Eureka Company in Bloomington, Illinois. On or about February 21, 1980, plaintiff was injured when she reached for a vacuum cleaner that was falling from the assembly line. She heard something pop in her neck and experienced pain. However, she continued to work that day. The next day her neck was stiff. The pain continued to increase over the next few months, eventually spreading to her back, right shoulder, arm, and hand. There were frequent occasions when plaintiff would wake up at night and her entire right arm would be paralyzed. During this same time frame, she had painful cramping of her right hand.

Following visits to the company physician, she consulted defendant about the problem. She had been seeing defendant for treatment of other ailments, and she brought the matter of her continued pain to him in March 1980. Initially, defendant gave her some exercises to do. In April 1980, defendant ordered her to undergo more intensive physical therapy, placed her in traction, and gave her some medication. Still, her pain continued. It reached the point where she described it as excruciating. In May 1980, defendant discussed the possibility of surgery to remove her right first rib in order to relieve pressure on a nerve that was being pinched. The condition was known as thoracic outlet syndrome. Plaintiff eventually agreed to undergo the surgery because of her pain, and the rib resection was performed on June 4, 1980.

During the surgery, plaintiff's lung was punctured, and she experienced some breathing difficulties afterward. However, as to her neck pain, she noted some improvement in the weeks following surgery. The pain never ceased but improved to where she described it as tolerable. Near the end of June 1980, plaintiff hired the attorney who now represents her in this cause to pursue a workers' compensation claim for her injury.

Plaintiff returned to work in early August with restrictions set by defendant on what work she could perform. She worked for only three days. On the third day, she was asked to engage in heavy labor for a few minutes to cover for someone who was on a break. In doing so, she experienced renewed and intensified pain. She was again out of work, this time for six weeks. She returned to work in late September. She stated that the pain had subsided at this time to where she could proceed with normal functioning; it did not hinder day-to-day living or her ability to work.

Nevertheless, the pain in the right side of her neck continued, and defendant referred plaintiff to Dr. Larry Nord, an orthopedic surgeon, in December 1980. Following an examination, Nord told her she had a neck strain that had gone untreated. Upon hearing this, she questioned Nord regarding the necessity of her rib resection surgery. Nord told her he could not give an opinion on that because he had not examined her prior to the surgery. He could only diagnose her current condition. Dr. Nord prescribed physical therapy and medication similar to the treatment originally prescribed by defendant.

In January 1981, plaintiff visited a third physician at the request of her attorneys. According to plaintiff, this physician, Dr. Douglas Collins, generally agreed with Dr. Nord's diagnosis. She received cortisone shots from him as well as a lecture about living with pain.

Plaintiff had not left defendant's care at this point, but had simply been referred to Dr. Nord for another opinion. When plaintiff returned to defendant on her next visit in February 1981, she discussed with defendant the diagnosis that Nord had given her. She told defendant that Nord had given her a different diagnosis of her problem. She could not recall his response.

In May 1981, she asked defendant to remove the work restrictions because she found the particular tasks available to her at work boring. Defendant removed the restrictions.

The insurance company involved in plaintiff's workers' compensation action requested that plaintiff undergo training in coping with pain. Plaintiff complied and entered a clinic in Champaign in November 1981. She did not get along with her physician at the clinic, and

she left after 11 days.

She continued to see Dr. Nord and defendant for treatment in the early months of 1982. Plaintiff's last visit to defendant was in June 1982. She reinjured her right arm and hand while working at Eureka in May 1982. Dr. Nord diagnosed the injury as carpal tunnel syndrome and operated in August 1982. She returned to work after the surgery and worked for the remainder of 1982.

Over the next several years, plaintiff visited several other physicians. In August 1986, plaintiff visited Dr. Paul Pederson. He diagnosed her as having lupus and prescribed medication for her. Pederson told her she had probably had lupus for quite some time. She stated that since she began taking the medication in August 1986, her pain decreased dramatically and was sometimes nonexistent. She currently feels the best she has felt in years.

In summarizing her statements regarding defendant, she stated that no doctor ever criticized the rib resection surgery performed by defendant. No physician ever told her defendant had misdiagnosed her condition or performed unnecessary surgery. Rather, it was on a visit to her attorneys that the question of the propriety of defendant's actions was raised with her.

Plaintiff initiated her medical malpractice action on December 21, 1983. Count I of her second and final amended complaint was directed against defendant. It alleged defendant was negligent in that he failed to properly diagnose plaintiff's illness, failed to refer plaintiff to a qualified specialist, failed to order the necessary tests and X rays, and then performed unnecessary surgery on plaintiff. Plaintiff included an allegation regarding the date she discovered defendant's negligent conduct:

> "Plaintiff *** discovered that she had been injured, and that her injuries were caused by the negligence of Defendant *** on or around August 15, 1983, after having been interviewed by her counsel in this cause. The Plaintiff did not know prior to August 15, 1983, nor in the exercise of reasonable diligence should she have known prior to that date, that her injuries were a result of the Defendant['s] *** negligence."

Following discovery, defendant moved for summary judgment alleging the cause of action against him was barred by the statute of limitations contained in section 13—212 of the Code (Ill. Rev. Stat. 1987, ch. 110, par. 13—212). The circuit court granted the motion. In its opinion, the court found that plaintiff was aware of the injury that had been caused her, and that it was wrongfully done, by mid-1981. Under section 13—212, her cause of action should have been com-

menced within two years thereafter. Because the suit was filed in December 1983, the court found it untimely filed.

Plaintiff argues several grounds as to why the trial court erred in granting summary judgment: (1) the facts do not show as a matter of law that plaintiff knew or should have known of her injury and its wrongful cause prior to her conversation with her attorney in August 1983; (2) the continued course of treatment doctrine precludes entry of summary judgment; and (3) defendant should be estopped from asserting the statute of limitations because his conduct masked any wrongdoing on his part.

■■ ■ Initially, plaintiff argues the facts do not favor defendant as a matter of law. The applicable statute of limitations for plaintiff's medical malpractice action is found in section 13—212 of the Code (Ill. Rev. Stat. 1983, ch. 110, par. 13—212) and, in pertinent part, it reads:

> "No action for damages for injury or death against any physician, *** arising out of patient care shall be brought more than 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known *** of the existence of the injury or death for which damages are sought in the action, whichever of such date occurs first, but in no event shall such action be brought more than 4 years after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death ***."

In *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 156, 421 N.E.2d 869, 874, the supreme court discussed the application of the "discovery rule" to the medical malpractice statute of limitations:

> "The statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused. At that point the burden is upon the injured person to inquire further as to the existence of a cause of action. [Citations.] In many, if not most, cases the time at which an injured party knows or reasonably should have known both of his injury and that it was wrongfully caused will be a disputed question to be resolved by the finder of fact. [Citation.] Where it is apparent from the undisputed facts, however, that only one conclusion can be drawn, the question becomes one for the court."

(See also *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 171, 421 N.E.2d 864, 868.) Elaborating on the above-quoted standard, the supreme court stated:

> "[W]e have held that the event which triggers the running of

the statutory period is not the first knowledge the injured person has of his injury, and, at the other extreme, we have also held that it is not the acquisition of knowledge that one has a cause of action against another for an injury he has suffered. ***

* * *

At some point the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. At that point, under the discovery rule, the running of the limitations period commences." (*Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 415-16, 430 N.E.2d 976, 980-81.)

Summary judgment is appropriate only where the pleadings, depositions, and affidavits, construed strictly against the movant and liberally in favor of the opponent, show that judgment should be granted as a matter of law. (*Saunders v. Klungboonkrong* (1986), 150 Ill. App. 3d 56, 61, 501 N.E.2d 882, 886.) Where reasonable persons may fairly draw differing inferences from those facts which are not in dispute, the motion must be denied. *Saunders*, 150 Ill. App. 3d at 61, 501 N.E.2d at 886.

In this case, defendant relies solely on plaintiff's deposition to support his motion for summary judgment. Specifically, defendant points to certain answers given by plaintiff that indicate she questioned the surgery when later examined by Dr. Nord. The following colloquy is from plaintiff's deposition:

"Q. Now, when you saw Doctor Nord in December of 1980, you just indicated to me that he told you that you had a cervical strain or a sprain of your neck?

A. Right.

Q. Did you tell Doctor Nord, well, wait a minute. Doctor Trefzger said I had a thoracic outlet syndrome. What have I got? In your own words, did you say anything like that to Doctor Nord?

A. I said to Doctor Nord, what are you saying? That I should never have had my rib taken out? And he said, I can't answer that. Didn't see you before you had it taken out.

Q. Why did you ask Doctor Nord that?

A. Because he was telling me the thing that what I had the pain from, see, he's telling me that it's something completely different.

* * *

Q. When he told you you had a cervical strain or sprain in your neck that had gone untreated, when he used the word untreated, did you stop and think to yourself, maybe Doctor Trefzger didn't treat this? Did that enter your mind then, Doctor Nord telling you that it wasn't treated?

A. Well, of course it did. It was like—yes.

Q. So did you ask Doctor Nord, well, wait a minute. You say I've got a cervical strain or sprain in my neck and Doctor Trefzger said I had a thoracic outlet syndrome. What have I got? Did you ask him that, or words to that effect?

A. No. I said, then I shouldn't have had my rib out. And he said, why, I don't know. I never saw you before that. All I know is what you got now.

Q. Why did you ask Doctor Nord the question that you just said, I shouldn't have had my rib out? Why did you ask him that?

A. Because he is telling me something completely different that is wrong, but it's the same problem that was supposed to have been fixed. And he put a completely different label on it.

Q. So when you asked Doctor Nord, you mean I shouldn't have had my rib out, you were questioning the treatment that had been given to you by Doctor Trefzger, in your own mind anyway?

A. I guess I was.

Q. And it certainly raised a question in your mind as to whether or not Doctor Trefzger should have ever taken your rib out in the first place, is that right, in your own mind?

A. I guess it did."

Shortly after this discussion, defendant's counsel directed questions at plaintiff regarding her subsequent visit to defendant. The following colloquy occurred:

"Q. *** When you went to see Doctor Trefzger in February of '81 you had a contrary opinion from a different doctor and that was on your mind?

A. Yes.

Q. And you wanted to raise it with Doctor Trefzger because you had some other doctor tell you something completely different?

A. Yes.

Q. And at least you were thinking in your own mind, Hey, wait a minute] Maybe Doctor Trefzger has made a mistake in telling me what I had wrong with me. Isn't that right? In the

back of your mind you were thinking that?

A. Yeah, evidently."

Defendant concludes these statements indicate plaintiff was aware of the possibility of defendant's wrongdoing in 1980, such as to require her to investigate further concerning the existence of a cause of action. Plaintiff states that Dr. Nord was not critical of the surgery performed by defendant. Rather, Nord could only give an opinion as to plaintiff's current condition. While plaintiff may have questioned defendant's actions, she received inconclusive answers from Nord. Moreover, she returned to defendant and continued to receive treatment from him until the late spring of 1982. Plaintiff argues she had no reason to believe a wrong had been done to her during this period.

■ We conclude the facts are not such as to cause fair-minded people to come to but one conclusion. Prior to surgery, plaintiff was in excruciating pain from an injury sustained at work. Following surgery, she noted improvement in her condition. She stated that as of late September 1980, the pain did not hinder her in day-to-day living, nor did it hinder her ability to work. However, the pain was never alleviated entirely. So, defendant referred her to Dr. Nord. Dr. Nord diagnosed a neck strain that had not been treated. As to the rib resection surgery, Nord told her he could not tell whether or not it was necessary. Plaintiff also visited a third physician in reference to her workers' compensation claim. This physician, Dr. Collins, offered a diagnosis similar to that of Nord. Yet, there is no testimony that he was critical of defendant's actions. Plaintiff returned to defendant and continued treatment with him until early June 1982. From 1982 until 1986, plaintiff visited many physicians. None of the other physicians were able to improve upon defendant's results until Dr. Pederson treated her for lupus in 1986. Patients normally extend a great deal of trust and confidence to their doctors. (See *Witherell*, 85 Ill. 2d at 159, 421 N.E.2d at 876.) Indeed, the doctor-patient relationship has been described as a fiduciary one. (*Fure v. Sherman Hospital* (1978), 64 Ill. App. 3d 259, 263, 380 N.E.2d 1376, 1380; see also *Witherell*, 85 Ill. 2d at 159-60, 421 N.E.2d at 876.) The basis of this trust is the knowledge and experience of the physician, and the patient's lack thereof. (*Witherell*, 85 Ill. 2d at 159, 421 N.E.2d at 876, quoting 61 Am. Jur. 2d *Physicians & Surgeons* §95, at 214 (1972).) In this case, plaintiff heard no criticism of the surgery from the other physicians she visited. Neither did the results of the surgery stand out as indications of improper conduct. Defendant apparently achieved a measure of success, and the other physicians could do no better until Dr. Pederson in 1986. We are not asked to evaluate a traumatic injury

where the patient's condition changes dramatically. Rather, the alleged injury is an unnecessary surgery. By nature, this type of injury is difficult, if not impossible, for a lay person to determine without signs stemming from the patient's body. Plaintiff's body gave defendant a mixed review, with both good signs and bad signs following the surgery. Under these facts, it is not clear that plaintiff knew or should have known of the possibility of defendant's wrongful conduct at the time of her visit to Dr. Nord, as defendant argues, or in the six months thereafter as the trial court found.

Because of our holding above, we need not respond to plaintiff's remaining arguments based on the continued course of conduct doctrine and equitable estoppel.

■ Defendant raises the argument that plaintiff's complaint does not allege the discovery rule with the required sufficiency. Plaintiff alleged that at a meeting with her attorneys in August 1983, she discovered that she had been injured and that her injuries were caused by defendant's negligence. Defendant argues that a consultation with attorneys is not sufficient as a matter of law. The cases cited by defendant do not stand for the proposition that a consultation with attorneys cannot be the point in time when discovery is made. (*Gaudynski v. Corbett* (1980), 81 Ill. App. 3d 910, 401 N.E.2d 1218; *Nelson v. Jain* (N.D. Ill. 1981), 526 F. Supp. 1154, *aff'd* (1983), 714 F.2d 150.) Rather, these cases hold that plaintiffs were apprised of sufficient facts to begin the limitations period prior to consultations with their attorneys. (*Gaudynski*, 81 Ill. App. 3d at 913, 401 N.E.2d at 1220; *Nelson*, 526 F. Supp. at 1156-57.) In this case, it is a reasonable inference from the facts that plaintiff became aware of the unnecessary surgery during a meeting with her attorneys. Her attorneys in this cause also represented her in her workers' compensation matter. These same attorneys have several actions pending against defendant for medical malpractice. It is reasonable to believe that in August 1983, plaintiff's attorneys discussed with her the possibility that defendant had performed unnecessary surgery and that this discussion apprised plaintiff of such facts as to begin the running of the limitations period. The point in time when a person should reasonably be apprised of facts sufficient to put her on notice that an injury has been done to her, and that the injury is wrongfully caused, is a question that must be decided based upon the facts in the record. Plaintiff pleaded an allegation that she received such notice when she consulted with her attorneys. As a matter of law, the facts do not show otherwise. We hold there is no error in plaintiff's pleading of the discovery rule.

For the foregoing reasons, the order of the circuit court of McLean County is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

GREEN, P.J., and KNECHT, J., concur.