ALFONSO DOCKERY, Deceased, by his Special Adm'r, Marian Dockery, *et al.*, Plaintiffs-Appellants, v. ARCADIO F. ORTIZ, JR., *et al.*, Defendants-Appellees.

Second District   No. 2—88—0830

Opinion filed June 30, 1989.

UNVERZAGT, P.J., dissenting.

John T. Jursich, of North Chicago, for appellants.

George E. Riseborough and Thomas K. Gerling, both of Brydges, Riseborough, Morris, Franke & Miller, and David F. Pardys, of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, both of Waukegan, and Cassidy, Schade & Gloor, of Chicago (Reid S. Jacobson, of counsel), for appellees.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiffs, Alfonso Dockery and Marian Dockery, filed a complaint in the circuit court of Lake County on October 10, 1986, against the defendant doctors alleging medical malpractice and loss of consortium after the amputations of Alfonso's legs. After his death, Marian Dockery was appointed special administrator and substituted in his stead in this cause, and plaintiffs' second amended complaint added wrongful death claims.

The court granted the defendants' motions for summary judgment grounded on the premise that plaintiffs' claims were time barred, and plaintiffs appeal.

Plaintiffs contend the court erred in granting summary judgment where the only pleadings and affidavits which properly could be considered by the court showed that a genuine issue of material fact ex-

isted: that is, whether plaintiffs knew of their injury and its wrongful causation as of February 1985, as contended by plaintiffs, or as of May 1984, as contended by the defendants. If the former, plaintiffs' complaint was timely; if the latter, it was barred by section 13—212 of the Limitations Act (Act) (Ill. Rev. Stat. 1985, ch. 110, par. 13—212(a)). Plaintiffs argue the court improperly considered unauthenticated excerpts from depositions in reaching its decision that plaintiffs knew or reasonably should have known of their injury and its wrongful causation by May 11, 1984, the date Alfonso Dockery's left leg was amputated.

The plaintiffs' statement of facts is unacceptable; it does not even mention the fact a motion for summary judgment was filed or that the court entered judgment on same in favor of the defendants. Pursuant to Supreme Court Rule 341 (113 Ill. 2d R. 341(f)), appellees provide a more complete statement of facts. The following facts are a synthesis of the facts set forth by the parties and the pleadings. No reports of proceedings of the hearings on the summary judgment motion and the plaintiffs' subsequent motion to strike and to vacate have been filed.

Although plaintiffs claim there are no undisputed facts, it is undisputed that the plaintiff experienced pain in his left foot and was hospitalized at St. Therese Medical Center and Hospital in Waukegan, Illinois, on October 4, 1982, under the care of the defendants. On October 11, defendant Dr. Ortiz performed aortofemoral and femoropopliteal bypasses. Alfonso continued to have pain and went to St. Joseph's Hospital in Marshfield, Wisconsin, where additional bypass surgeries were performed on December 9 and December 16, 1983, by Dr. Mark Swanson. Plaintiff's pain was 100% relieved following these surgeries.

On May 1, 1984, plaintiff suffered severe pain in both legs after attempting to remove an automobile tire from its rim. He went to the emergency room at St. Therese Medical Center and Hospital (St. Therese Hospital) in Waukegan and was admitted there under the defendants' care until May 5. On May 5, he was admitted to St. Joseph's Hospital in Marshfield, Wisconsin. Bypass surgery was performed there on May 6, which was unsuccessful, and plaintiff's left leg was amputated five days later, on May 11. Subsequently, in November 1984, his right leg was also amputated.

Plaintiffs' medical malpractice complaint against the defendants for treatment rendered during the period October 1982 to May 1984 was filed on October 10, 1986. Defendants filed a motion to dismiss pursuant to section 2—619 of the Civil Practice Law on the ground

the action was not commenced within the two-year time period prescribed by section 13—212 of the Act. (Ill. Rev. Stat. 1985, ch. 110, pars. 2—619(a)(5), 13—212.) Defendants alleged that inasmuch as plaintiff's left leg was amputated above the knee at St. Joseph's Hospital on May 11, 1984, he knew, or through the use of reasonable diligence should have known, of the alleged cause of action as of that date. The motion was supported with affidavits of defendants Ortiz, Agujar, and Allian, each of whom averred he neither consulted with nor treated Alfonso Dockery for any reason following his discharge from St. Therese Hospital on May 5, 1984.

Plaintiffs' response denied they knew or reasonably should have known that medical malpractice had been committed from the mere fact of the amputation and that the cause was filed within the four-year outside limit prescribed in the Act. (Ill. Rev. Stat. 1985, ch. 110, par. 13—212(a).) Plaintiffs' response was supported by the affidavit of Alfonso Dockery in which he averred he was 56 years old, had 11 years of education, did not graduate from high school, and spent his entire life doing factory work. He further averred that from October 1982 to February 1985 he had numerous surgical procedures and amputations which resulted in the loss of both his legs at the hip and that until February 1985 he believed he lost his legs due to his diabetes which, he averred, was the opinion of Dr. Arcadio Ortiz that was related to him in October 1982. Plaintiff averred additionally that from May 1984 to April 1985 he was heavily sedated for pain and was not aware until January or February 1985 that he had lost both his legs and that such loss may have been due to a mistake made by the doctors. Plaintiff averred he never sued anyone, and he did not know until August 1986 that a doctor could be sued for a mistake. Because the plaintiffs had filed a counteraffidavit to the defendants' motion to dismiss and had filed a jury demand, the court denied the defendants' motion to dismiss. Ill. Rev. Stat. 1985, ch. 110, par. 2—619(c).

Defendants' answer to plaintiffs' second amended complaint raised the affirmative defenses of the statute of limitations and that the loss of plaintiff's legs and his death were due to his arteriosclerosis and cardiovascular disease. Plaintiffs' answer to defendants' first affirmative defense was that plaintiff did not learn of the medical malpractice until approximately February 1985 and had no reason to suspect medical negligence until that time. Plaintiffs denied defendants' second affirmative defense, stating the cause of death was the proximate result of the medical negligence alleged in the complaint. Thereafter, plaintiffs voluntarily dismissed counts V and VI of their complaint for wrongful death on behalf of their adult children.

Defendants then filed a motion for summary judgment. It alleged plaintiffs knew or reasonably should have known of the existence of their injuries and their wrongful causation no later than May 11, 1984, either because the amputation of plaintiff's left leg on that date was a traumatic event which triggered the running of the limitations period, or because the history of plaintiff's medical treatment indicates he was dissatisfied with defendants' medical care inasmuch as he sought treatment twice in another medical facility several hundred miles from his home after receiving treatment from the defendants. The motion was supported with excerpts of Marian Dockery's and Dr. Arcadio Ortiz' depositions and copies of St. Joseph's Hospital operative reports which tended to establish (1) plaintiff's left foot pain did not diminish after the Ortiz surgery in October 1982 at St. Therese's in Waukegan but, rather, it increased and spread into his left leg; (2) he felt "100% fine" after additional bypass surgery performed at St. Joseph's in Marshfield in December 1983; and (3) after his admission to St. Therese's on May 1, 1984, for tremendous pain and numbness in both legs, plaintiff's left leg began to turn progressively darker and cold to the touch, his pain increased during the next four days, he was alert and coherent during that time, he was transferred to St. Joseph's in Marshfield, where bypass surgery was performed on May 6, and his left leg was amputated above the knee on May 11, 1984.

Plaintiffs' response to defendants' motion for summary judgment admitted plaintiffs knew of their injury but denied they knew of its wrongful causation. They argued that plaintiff, who had achieved only a twelfth-grade education and was engaged in labor activities all his life, could not reasonably have known that the amputation of his left leg in May 1984 may have been wrongfully caused by the defendants' malpractice. Plaintiffs' response was supported by excerpts of Marian Dockery's deposition, the October 11, 1982, operative report of Dr. Ortiz, and a report prepared by his family physician, Dr. Gerard Pierre-Jerome, which established (1) that Alfonso Dockery was told by Dr. Ortiz that if he did not have surgery, he might eventually have to lose a leg and that the diabetes was contributing to his condition; (2) after the October 1982 surgery, Dr. Ortiz told plaintiff that the pain would take time to go away; and (3) his leg felt better after the additional bypass surgery at Marshfield until May 1984 when he used his feet to try to get a tire off a rim. Plaintiffs argued his continued pain and the additional, as opposed to corrective, bypass surgery performed in Marshfield in 1983 were not sufficient to reasonably put him on notice of any wrongful causation, particularly where Dr. Ortiz "predicted" in October 1982 that he may eventually lose a leg because

he had diabetes and occluded arteries.

Defendants' reply to the plaintiffs' response noted that the reasonable-man standard requires an objective, not subjective, analysis. Further, the facts that plaintiff's pain worsened during the four days in May 1984 when he was under the defendants' care and that he transferred several hundred miles away to Marshfield for treatment "clearly indicate[d] that the plaintiff felt that he may have received improper care or diagnosis" under the defendants' care. Defendants' reply was supported by reference to, rather than copies of, excerpts of the depositions of the two doctors who treated the plaintiff in Marshfield, Drs. Swanson and Duffy. The excerpts established that plaintiffs were aware of their potential claim against the defendants in May 1984 when plaintiff transferred from St. Therese's. Specifically, defendants represented that Dr. Swanson was deposed as follows:

"Q. Were you at the hospital waiting for Mr. Dockery when he arrived?

A. I believe I was.

Q. And, what did you find when he arrived?

A. Well, I found a guy with both legs that were dying, a pretty sick man. Accompanying him was an arteriogram which showed occluded aorta and a pretty desperate situation.

\* \* \*

Q. Did you have an opportunity to discuss with Mr. Dockery, your plan at that time?

A. Yes, I did.

Q. And what did you tell him?

A. I told him I thought we had a desperate situation, that I was almost sure he was going to lose probably both legs. What I was concerned about is the level of his ischemic sign was getting so high that he might end up clear up into his hips. That I hoped [—] that I thought we ought to try something to get blood flow back there to try to save as much of his legs in terms of from the hip down as that was possible. But I thought there was a tiny outside chance we might be able to save one leg and, you know, even less of an outside chance to save the left leg which already had problems.

\* \* \*

Q. Doctor, did Mr. Dockery or his wife ever indicate to you that they were dissatisfied with the care Mr. Dockery received in May of 1984 at St. Therese?

A. Yes.

Q. Can you tell me what they said?

A. Just in a general way. He just couldn't understand why he laid [*sic*] in the hospital for four and a half days hurting.

Q. That was Mr. Dockery that said that?

A. Yes.

\* \* \*

Q. Did you ever suggest to him that he was at St. Therese longer than he should have been?

A. Indirectly, I suspect I did. I don't think I did directly. I did suggest to him that, you know, when you have the kind of problem he does, the quicker it's fixed the better chance you have to do things.

Q. And, you discussed this with Mr. Dockery you said?

A. I'm sure I did. I mean, you know, when I have to tell him I don't know if I can work or not because this is five days after the fact that it will make things worse, what are you going to say?''

Additionally, defendants represented that Dr. Duffy testified during deposition as follows:

"Q. Doctor, at any time during that admission, did Mr. Dockery complain about the care he had received by any of the physicians in the Waukegan area?

A. Well, I don't recall that I noted anything like that specifically. His general attitude like when he first came was that things weren't explained to his satisfaction and he wasn't sure things were proceeding as they should and he was reluctant to be transferred back very soon.

Q. Back to Waukegan for further care?

A. Well, back to the Chicago area anyway.

Q. So, he expressed to you at some point that he did not receive an adequate explanation of his care or of his condition? Obviously, I am not asking for direct quotes. I'd like your best recollection.

A. Something to that effect, yes.

Q. Did you have any opportunity to speak to Mrs. Dockery at any time during the course of your treatment of Mr. Dockery?

A. Yes. I think I met her several times.

Q. Do you recall whether or not she had any complaints regarding her husband's care in Waukegan?

A. I can't recall that I talked about that with her. It was obviously very inconvenient for the family to continue visiting

and caring for him and being with him in the hospital up here during his multiple hospitalizations. If they didn't agree with him, I am sure they would have pressured him to go to a more geographically convenient location."

After argument, the court granted the defendants' motion for summary judgment, finding that the facts clearly showed that plaintiff reasonably should have known as of May 1984 that a connection existed between his injury and the defendants' treatment of him. Thereafter, plaintiffs moved to strike the deposition attachments to the defendants' motion for summary judgment inasmuch as they were not certified and were contrary to the requirements of Supreme Court Rule 207. (107 Ill. 2d R. 207.) In their contemporaneously filed motion to vacate summary judgment, plaintiffs argued there were no admissions, affidavits, or depositions on file which would negate the genuine issue of material fact raised by virtue of the complaint and answer.

Defendants responded, noting plaintiffs were aware the original transcripts of Drs. Swanson's and Duffy's depositions were unavailable at the time motion for summary judgment was filed. Moreover, they argued, plaintiffs did not raise this objection at any time before the court ruled on the summary judgment motion, and, in fact, had presented no challenge to the *authenticity* of the depositions. Defendants also filed a motion for leave to file the complete, signed, and certified deposition transcripts of Drs. Swanson and Duffy.

The court denied the plaintiffs' motion to strike the deposition attachments and granted defendants leave to file the original deposition transcripts *instanter*. The court also denied plaintiffs' motion to vacate its summary judgment, stating it did not consider the instant certified depositions in rendering summary judgment. Plaintiffs' notice of appeal was timely filed.

■ A court will grant summary judgment when the pleadings, depositions, admissions on file, and affidavits present no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240; Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c).) That is, summary judgment is appropriate when there is no dispute as to any material fact but only as to the legal effect of the facts. (*First State Bank v. Busse* (1984), 126 Ill. App. 3d 577.) The purpose of summary judgment is not to try a question of fact, but to determine whether one exists. *Addison v. Whittenberg* (1988), 124 Ill. 2d 287, 294.

■ ■ In determining whether a summary judgment is appropriate, the trial court must construe all pleadings, depositions, admis-

sions, and affidavits strictly against the moving party and liberally in favor of the opponent. (*Dodd v. Cavett Rexall Drugs, Inc.* (1988), 178 Ill. App. 3d 424, 432.) The party moving for summary judgment must affirmatively show a clear legal right thereto free from doubt, and if any facts upon which reasonable persons may disagree are identified, or inferences which may be drawn from those facts lead to different conclusions, the court must deny the motion and direct that resolution of those facts and inferences be made at trial. (*La Salle National Bank v. Illinois Housing Development Authority* (1986), 148 Ill. App. 3d 158.) The reviewing court's sole function on appeal from a grant of summary judgment is to determine whether the trial court correctly ruled that no genuine issue of material fact had been raised and, if none was raised, whether judgment correctly was entered as a matter of law. (*Coleman v. Windy City Balloon Port, Ltd.* (1987), 160 Ill. App. 3d 408, 416.) An order allowing summary judgment will be reversed on appeal if the reviewing court determines that a genuine issue of material facts exists. *Addison*, 124 Ill. 2d at 294.

▮▮▮ The relevant Illinois limitations statute provides that actions for damages for injury or death against any physician or hospital must be brought within two years after the date on which the claimant knew, or through the use of reasonable diligence should have known, that the act or omission or occurrence alleged in such action was the cause of such injury or death and in no event may such action be brought more than four years after the date of that act or omission or occurrence. (Ill. Rev. Stat. 1985, ch. 110, par. 13—212(a).) The effect of this "discovery rule" is to postpone the starting of the period of limitations until the injured party knows or should have known of his injury (*Lipsey v. Michael Reese Hospital* (1970), 46 Ill. 2d 32, 40; *Kinsey v. Scott* (1984), 124 Ill. App. 3d 329, 339) and also knows or reasonably should have known that it was wrongfully caused (*Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 169; *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 156; *Moore v. Jackson Park Hospital* (1983), 95 Ill. 2d 223). These are two different elements, and they need not be concomitant. (*Skoglund v. Blankenship* (1985), 134 Ill. App. 3d 628, 631.) The term "wrongfully caused" does not mean that one must have actual knowledge of negligent conduct or knowledge of the existence of a cause of action before the statute may be triggered. (*People ex rel. Skinner v. Graham* (1988), 170 Ill. App. 3d 417, 429.) The statute of limitations begins to run "when there is a concurrence of the actual or constructive knowledge of both the physical problem and the possibility that someone is at fault for its existence." (*Roper v. Markle* (1978), 59 Ill. App. 3d 706, 710.) "At some point the injured

person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person *on inquiry* to determine whether actionable conduct is involved." (Emphasis added.) *Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 416.

■■ ■ The discovery rule is not applicable in determining when the statute of limitations begins to run in a case where the plaintiff is injured by a sudden traumatic event. An action to recover for personal injuries resulting from a sudden traumatic event accrues when the plaintiff first knew of his right to sue, *i.e.*, at the time the injury occurred. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418.) "The question of when a party knew or reasonably should have known both of an injury and its· wrongful cause is one of fact, unless the facts are undisputed and only one conclusion may be drawn from them." *Nolan*, 85 Ill. 2d at 171, citing *Witherell*, 85 Ill. 2d at 156; *Kirksey v. Trefzger* (1988), 175 Ill. App. 3d 891, 896.

Since there is no dispute in this case that plaintiff discovered his injury in May 1984 after his admission to St. Therese's Hospital, we need only determine whether plaintiff discovered or should have reasonably discovered that his injury was wrongfully caused by the treatment administered or not administered by the defendants.

The trial court here found "the facts clearly show that [plaintiff] reasonably should have known that as of May 1984, a connection exist[ed] between his injury and the treatment given him by the defendants." Its judgment was based on the "traumatic event" of the loss of plaintiff's left leg above the knee at that time and the fact that the plaintiff's course of conduct in seeking treatment elsewhere after being in the defendants' care shows that plaintiff was dissatisfied with his treatment at their hands. Thus, he reasonably should have known that his injury was wrongfully caused.

■■ We disagree with the trial court's finding that the amputation of the plaintiff's leg was a sudden traumatic event which should have prompted some investigation by the plaintiff and thus triggered the application of the discovery rule. (*Nordsell v. Kent* (1987), 157 Ill. App. 3d 274; see also *Lutes v. Farley* (1983), 113 Ill. App. 3d 113, 115.) The traumatic event in both *Lutes* and *Nordsell* was a stillborn birth. In the case before us, plaintiff's injury was not the sudden, unexpected type of injury suffered in those cases, inasmuch as plaintiff here had a history of vascular disease and diabetes which in the past had particularly affected his legs. Consequently, we believe that the discovery rule must be applied in determining when plaintiff knew or reasonably should have known of his injury and its wrongful causation.

Defendants contend that plaintiff knew or reasonably should have known as of May 1984 that a connection existed between his injury and the defendants' wrongful treatment, based upon the following: (1) plaintiff's move from St. Therese's Hospital to Marshfield, Wisconsin, in October 1982, which indicated his dissatisfaction with the defendants' medical care; (2) that in May 1984, plaintiff again sought treatment in Marshfield, Wisconsin, and at that time, indicated his dissatisfaction with defendants' care; and (3) that on May 1, 1984, when plaintiff was admitted to St. Therese's Hospital, he was in great pain, had numbness in both legs, and his left leg was turning darker and cold and his pain increased during the next four days.

In response to defendants' motion for summary judgment, plaintiffs denied that Alfonso had sufficient information to be aware of or to know that he suffered any wrongful medical treatment at the hands of the defendants based upon the following factors: (1) his leg felt better after the first surgery in Marshfield, Wisconsin, until May 1984; (2) that he was told by defendant, Dr. Ortiz, that if he did not have surgery, he might eventually lose a leg and that diabetes was contributing to his condition; (3) that Dr. Ortiz told him that the pain would take time to go away; and (4) Dr. Ortiz predicted in October 1982 that he might possibly lose a leg due to diabetes.

■ Plaintiffs contend that Alfonso Dockery reasonably did not know of the wrongful causation of his injury in view of his educational and occupational background and the fact that he was in constant pain which required medication. We agree with the dissent in this case that although the court in. *Hayes v. Weyrens* (1973), 15 Ill. App. 3d 365, cited by the plaintiffs, tested the plaintiff's ability to reasonably know of her injury's wrongful causation *subjectively* (*i.e.*, with reference to her particular capabilities) rather than *objectively* (the capabilities of any person in general), the language of section 13—212 requires the plaintiff to use "reasonable diligence" in discovering his injury's wrongful causation, an objective standard. (Ill. Rev. Stat. 1985, ch. 110, par. 13—212(a).) We further agree that plaintiffs' latter contention is refuted by Marian Dockery's deposition testimony that Alfonso was alert and coherent and understood that he was going to and did lose a leg.

The dissent in this case argues that even assuming *arguendo* that plaintiff should be tested by a subjective standard, Dr. Swanson's deposition testimony effectively refuted Alfonso's subjective inability to know of a possible link between defendants' treatment of him and his injury. The dissent points to the excerpts of Dr. Swanson's deposition testimony cited above in which Alfonso told him "[h]e just

couldn't understand why he laid [*sic*] in the hospital for four and a half days hurting"; that Dr. Swanson also testified that he told Alfonso that suffering from the kind of problem Alfonso had, "the quicker it's fixed the better chance you have to do things"; and that Dr. Swanson was certain he discussed this with Alfonso because "when I [had] to tell· him I don't know if I [*sic*] can work or not because this is five days after the fact that it will make things worse, what are you going to say?" The dissent also relies on this additional excerpt from Dr. Swanson's deposition:

"Q. Did you ever suggest to Mr. Dockery or Mrs. Dockery that the physicians at St. Therese should have transferred him up quicker or done something at that facility?

A. I don't think I directly addressed that problem, no. I—but—I don't recall, I really don't.

Q. But, you did tell him that the quicker he would have been sent out the more likely the problem—

A. (Interrupting) I did tell him the sooner you can fix one of these things the better chance you have of coming out with a successful result.

* * *

Q. Were there any further discussions or any discussions, Doctor, at any time that you saw Mr. Dockery during which he either told you again tht [*sic*] he was dissatisfied with the manner in which he was treated at St. Therese or that you indicated that something else could have happened if he would have been transferred out quicker?

* * *

A. I don't recall discussing anything about the care down there with either one of them other than probably the first day or two when I said, you know, we're going to have problems because of the length of the ischemia that he had."

("Ischemia" is defined as "local anemia produced by local obstacles to the arterial flow." Random House Dictionary of the English Language 754 (1983).)

We disagree with the dissent's "characterization" of Dr. Swanson's testimony. Far from effectively refuting the contention that Alfonso did not know of a possible link between his injury and defendants' treatment of him, even using the objective standard required under the statute, Dr. Swanson's testimony strongly suggests that at the very best, he was uncertain of exactly what he told plaintiffs. While Dr. Swanson was certain that he had told Alfonso that the "sooner you can fix one of these things the better," there is no indica-

tion as to what time period Dr. Swanson was referring to by this comment (see *Saunders v. Klungboonkrong* (1986), 150 Ill. App. 3d 56, 61), nor did Dr. Swanson ever discuss the care Alfonso received at St. Therese's after the first day or two when he stated that there would be problems because of the length of the ischemia Alfonso had.

In *Saunders v. Klungboonkrong*, the plaintiff fractured his left humerus and collarbone in an automobile accident in 1967. A metal plate was used to repair the humerus. Plaintiff was referred to the defendant, Dr. Klungboonkrong (referred to in the opinion as Dr. Klung), in November 1978, when he began experiencing numbness in his left hand when it was exposed to cold weather. Dr. Klung diagnosed plaintiff's problem as Raynaud's disease phenomenon, a vasospastic disorder of the blood vessels possibly caused by the old humerus fracture site or plaintiff's mild diabetic condition. Plaintiff saw Dr. Klung one other time for this same problem prior to April 1981. On April 26, 1981, Dr. Klung was called from the emergency room at Marshall Browning Hospital with regard to the plaintiff, who had come there complaining of numbness and aching in his left arm and hand, which had both turned white and red. Dr. Klung prescribed two vasodilating agents for him, and plaintiff's condition improved thereafter without having taken any medication. Shortly after midnight on April 28, 1981, however, the plaintiff experienced excruciating pain in his left hand, which was white and cold. Plaintiff was advised by phone to take the medication. Two hours later, plaintiff's wife told the doctor by phone the medicine was not effective, and she was advised by Dr. Klung that the plaintiff should relax and give the medication time to work.

Approximately three hours later, plaintiff went to the emergency room; Dr. Klung was called, and the plaintiff was admitted to the hospital. At 9:30 a.m., Dr. Klung visually examined plaintiff's arm, left the room, and returned several minutes later, stating that plaintiff was being transferred to St. Louis University. Plaintiff was examined by Drs. Peterson and McBride on April 29, 1981; Dr. McBride concluded plaintiff's left hand and forearm were markedly ischemic with irreversible tissue changes. Dr. McBride informed the plaintiff he would probably lose his arm " 'in light of the duration of the signs and symptoms.' " (*Saunders*, 150 Ill. App. 3d at 58.) Plaintiff's left hand was amputated on May 11, 1981. In March 1982, plaintiff learned for the first time from Dr. Peterson that a person can only experience ischemia for four to six hours before the dying of tissue begins.

Plaintiff filed his complaint against the defendants on December

16, 1983. The trial court granted the defendants' motion for summary judgment on the grounds the statute of limitations began to run on May 11, 1981, the date of the plaintiff's "traumatic injury," the amputation. That judgment was reversed, and the cause was remanded on appeal. The court determined the amputation, although a traumatic event, was not a traumatic injury which would trigger the running of the statute, inasmuch as plaintiff had no reason to believe the removal of his hand was necessitated by anything other than nonnegligent organic causes. The court considered that when the doctors told plaintiff he would probably lose his arm "in light of the duration of the signs and symptoms," plaintiff had no way of knowing the doctors were referring to the delay in treating his hand and arm on the morning of April 28, 1981, and he reasonably could have believed the doctors were referring to the length of time he had been having the numbness problem in general.

The dissent distinguishes *Saunders* on the basis that Dr. Swanson explained to Alfonso that he did not know if his treatment of him would work since it was "five days after the fact," which the dissent characterizes as a clear reference to the sudden onset of plaintiff's pain on May 1, after which time he was under the defendants' care, and Dr. Swanson's statement to Alfonso that "the sooner you fix one of these things the better chance you have of coming out with a successful result."

We find *Saunders* to be dispositive of the result in the case before us. Defendants rely on the fact that Alfonso was unhappy with the treatment he received from the defendants based upon Dr. Swanson's statement that Alfonso could not understand why he lay in the hospital for 4½ days, as an indication that Alfonso then knew someone was at fault for his condition. That is but one inference that can be drawn. It might equally be as true that Alfonso's complaints were due to the fact that the discomfort he was in had not been alleviated during his 4½ days at St. Therese's. Further, Dr. Swanson's comments regarding the 4½-day delay in treating Alfonso are not conclusive on the issue of knowledge. Dr. Swanson spoke in terms of a "better chance" of having successful results, and given his medical history and the fact he had already been warned he could lose a leg, we cannot say conclusively that Alfonso recognized or should have known as a reasonable person that his condition was the fault of defendants.

Defendants rely on *Blair v. Blondis* (1987), 160 Ill. App. 3d 184, *Conley v. Springfield Clinic* (1985), 130 Ill. App. 3d 369, and *Gaudynski v. Corbett* (1980), 81 Ill. App. 3d 910, as cases in which plaintiff's awareness of a physical problem, together with express dissatisfaction

with his treatment and statements by other medical professionals, determined when the plaintiff should reasonably have known of his injury and its wrongful causation. Each case, however, is distinguishable from the case at bar.

In *Gaudynski*, the plaintiff underwent surgery for the repair of a fracture and developed an infection diagnosed as osteomyelitis in 1970. After a second surgery, he was still receiving treatments for the infection. In 1971, he underwent a third surgery to remove part of the bone in the hip area. His doctor told him that in the course of the third operation, the bone had been found to be infected and that plaintiff had osteomyelitis. Plaintiff had been told by medical personnel that such an infection could develop in anyone at any time. The reviewing court determined that when the plaintiff was informed in 1971 that he had osteomyelitis, at that point, plaintiff should have known his injury was caused by the improper care of the defendants.

In *Conley*, following the operation, the plaintiff complained of pain in her shoulder, and her shoulder drooped. She stated to the defendant's nurse that the defendant had cut something he shouldn't have. The reviewing court held that therefore plaintiff knew she was injured and attributed the injury to the defendant's conduct.

In *Blair*, plaintiff, in January 1981, underwent an excision biopsy which resulted in the removal of approximately one-half of her left breast. Upon reviewing the results of the surgery, she became extremely upset and immediately solicited plastic surgeons to have reconstructive surgery performed. In February 1981, one such surgeon told plaintiff that it had been unnecessary for the defendant to remove so much tissue during the biopsy. The reviewing court upheld the jury's verdict for the defendant on the basis that the information plaintiff received in February 1981 should reasonably put her on notice that her injury was wrongfully caused.

In each of the above cases, the facts demonstrate that plaintiffs either acknowledged by their conduct that they knew their physician was likely responsible for their injury or were given that information by other professionals. The facts in those cases lead to but one conclusion, that those plaintiffs knew or should have known that their injury was wrongfully caused, thus triggering the running of the statute of limitations.

As we stated previously, the defendants in this case, as the parties moving for summary judgment, must affirmatively show a clear legal right thereto, free from doubt, and if the inferences drawn from the facts of this case lead to different conclusions, then the motion for summary judgment was improperly granted, and the case must be re-

turned to the trial court for resolution of those inferences at trial.

The facts in the case before us are not such as to cause fair-minded people to come to but one conclusion. (*Kirksey*, 175 Ill. App. 3d at 899.) It is correct that Alfonso was informed that the sooner he was treated the greater his chances for a successful outcome. However, the fact that his chances were better, had there been no delay, did not remove the possibility of amputation. Given the fact that he had already been told that he could lose his leg from diabetes, we cannot say that plaintiffs knew or should have known as of May 11, 1984, that his injury was due to wrongful acts of the defendants.

Based upon all of the foregoing, the judgment of the circuit court granting summary judgment to defendants is reversed, and this cause is remanded for further proceedings.

Reversed and remanded with directions.

NASH, J., concurs.

PRESIDING JUSTICE UNVERZAGT, dissenting:

I dissent from the decision of the majority because I believe the trial court was correct in granting the defendants' motion for summary judgment when the undisputed facts presented in this record admit of only one conclusion: that the plaintiffs knew or reasonably should have known both of their injury and its wrongful causation as of May 11, 1984. Therefore, the judgment of the trial court should be affirmed.

Plaintiffs argue Alfonso Dockery reasonably did not know of the wrongful causation of his injury in view of his educational and occupational background, and the fact he was in constant pain which required medication. Although the court in *Hayes v. Weyrens* (1973), 15 Ill. App. 3d 365, cited by plaintiffs, tested the plaintiff's ability to reasonably know of her injury's wrongful causation *subjectively* (*i.e.*, with reference to her particular capabilities) rather than *objectively* (the capabilities of any person in general), the language of section 13—212 requires the plaintiff use "reasonable diligence" in discovering his injury's wrongful causation, an objective standard (Ill. Rev. Stat. 1985, ch. 110, par. 13—212(a)).

Even assuming *arguendo* plaintiff should be tested by a subjective standard, Dr. Swanson's deposition offered by defendants here effectively refuted plaintiff's inability to know of a link between their treatment of him and his injury. As noted in the excerpts of Dr. Swanson's deposition testimony, Alfonso Dockery told him "[h]e just

couldn't understand why he laid [*sic*] in the hospital for four and a half days hurting." Dr. Swanson also testified he told Alfonso that when you have the kind of problem Alfonso had, "the quicker it's fixed the better chance you have to do things." Dr. Swanson was certain he discussed this with Dockery because: "When I [had] to tell him I don't know if I [*sic*—presumably "it"] can work or not because this is five days after the fact that it will make things worse, what are you going to say?" Dr. Swanson's deposition contains this further testimony:

"Q. Did you ever suggest to Mr. Dockery or Mrs. Dockery that the physicians at St. Therese should have transferred him up quicker or done something at that facility?

A. I don't think I directly addressed that problem, no. I—but—I don't recall, I really don't.

Q. But, you did tell him that the quicker he would have been sent out the more likely the problem—

A. (Interrupting) I did tell him the sooner you can fix one of these things the better chance you have of coming out with a successful result.

\* \* \*

Q. Were there any further discussions or any discussions, Doctor, at any time that you saw Mr. Dockery during which he either told you again tht [*sic*] he was dissatisfied with the manner in which he was treated at St. Therese or that you indicated that something else could have happened if he would have been transferred out quicker?

\* \* \*

A. I don't recall discussing anything about the care down there with either one of them other than probably the first day or two when I said, you know, we're going to have problems because of the length of the ischemia that he had."

Plaintiffs' further contention that the pain and medication prevented Alfonso from realizing his injury was refuted by Marian Dockery's deposition testimony that Alfonso was alert and coherent and understood that he was going to and did lose a leg.

Plaintiffs also contend they could not reasonably have known of the wrongful causation of their injury because the defendants told Alfonso he could lose his leg from diabetes. Marian Dockery stated in her deposition, however, that the defendants discussed with Alfonso that the diabetes was "contributing to his condition." The "condition" to which Alfonso's diabetes contributed was, according to Dr. Ortiz's October 11, 1982, operative report, "occlusive peripheral vascular dis-

ease." Further, Marian Dockery testified her husband did not want to have the first surgery in October 1982 but that the defendants told him "surgery was absolutely necessary *or* he would eventually lose a leg." (Emphasis added.) She also testified the first time Alfonso learned he had diabetes was when the defendants recommended surgery to relieve his clogged arteries. Plaintiffs argue that the loss of plaintiff's legs could reasonably have been viewed by him as the result of the defendants' previously announced cause of diabetes rather than defendants' negligence. Although the majority does not discuss it, plaintiffs claim the instant cause is "on all fours" with *Watkins v. Health & Hospitals Governing Comm'n* (1979), 78 Ill. App. 3d 468.

In *Watkins*, the plaintiff was being treated at Cook County Hospital for a kidney infection. In connection with one of the tests being performed on her, she was injected with a certain type of dye which caused her to develop blood clots. The clots ultimately necessitated the amputation of her right leg at the knee. The defendant's motion to dismiss was granted on the ground the suit was time barred under the statute of limitations of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1973, ch. 85, pars. 8—101 through 8—103). On appeal, the cause was reversed and remanded after the court examined the issue under that statute of limitations as well as section 22.1 of the Limitations Act (Ill. Rev. Stat. 1975, ch. 83, par. 22.1), codified since 1982 as the section presently being considered (Ill. Rev. Stat. 1985, ch. 110, par. 13—212).

The *Watkins* court subscribed to the view expressed in *Kristina v. St. James Hospital* (1978), 63 Ill. App. 3d 810, 813, that the classification of an injury as traumatic or nontraumatic, alone, is of no significance. Generally, if an injury is traumatic in nature, that is, immediate and caused by an external force or violence, the plaintiff knows or should know of his right to sue when injured. (*Saunders v. Klungboonkrong* (1986), 150 Ill. App. 3d 56, 60.) The more obvious an injury is, the more easily a plaintiff should be able to know of its wrongful causation. (*Saunders*, 150 Ill. App. 3d at 60; *Pszenny v. General Electric Co.* (1985), 132 Ill. App. 3d 964, 966.) The *Watkins* court, however, observing that plaintiff's complaint alleged she was a known diabetic and the defendant should have known that blood clots could present future problems for her, found it was possible for the plaintiff to have her leg amputated and reasonably believe *that it was caused by her diabetic condition* rather than the hospital's negligence in administering the dye test to her. (*Watkins*, 78 Ill. App. 3d at 472.) Referring again to *Kristina*, the *Watkins* court acknowledged that the nature and circumstances of an injury may be such that its cause

is unknown or apparently innocent at the time it occurs, and that there was nothing in the pleadings to suggest that the plaintiff there reasonably should have become aware of the connection between the dye test and the amputation of her leg. *Watkins*, 78 Ill. App. 3d at 472.

I note at this point the majority has correctly concluded that Alfonso's injury was not the type of traumatic injury that has been found to trigger the running of the statute of limitations and that the discovery rule must be applied.

Unlike *Watkins*, however, the pleadings, depositions, and exhibits here clearly show Alfonso reasonably should have been "on inquiry" as of May 11, 1984. The state of mind in May 1984 which prompted Alfonso to question why defendants left him "hurting" for four days in May 1984, combined with the information from Dr. Swanson that the "quicker" and "sooner" treatment is begun, the better the chance for success, and with Dr. Swanson's explanation to him that it was "five days after the fact," indicates there was a concurrence of knowledge of both the physical problem and the possibility that someone was at fault for its existence. Unlike the unrelated kidney infection/dye test and amputation in *Watkins*, the progression of the pain, darkening and coldness in Alfonso's legs during the four days in May when he was under the defendants' care was directly related to whether Dr. Swanson would be able to restore circulation to his legs and prevent partial or total amputation.

For these same reasons, the majority's reliance on *Saunders v. Klungboonkrong* (1986), 150 Ill. App. 3d 56, as dispositive of the instant cause is misplaced. In *Saunders*, the court considered that when the doctors told plaintiff he would probably lose his arm "in light of the duration of the signs and symptoms," plaintiff had no way of knowing the doctors were referring to the delay in treating his hand and arm on the morning of April 28, 1981, and he reasonably could have believed the doctors were referring to the length of time he had been having the numbness problem in general.

In contrast here, Dr. Swanson explained to Alfonso that he did not know if his treatment of him would work or not since it was "five days after the fact," a clear reference to the sudden onset of Alfonso's pain on May 1 after which time he was under the defendants' care. Dr. Swanson further indicated to Alfonso that when you have the kind of problem Alfonso had, "the sooner you can fix one of these things the better chance you have of coming out with a successful result." Dr. Swanson's reference to "one of these things" refers to what is indicated on his May 6, 1984, operative report (appended to

defendants' motion for summary judgment) as "total aortic occlusion" of Alfonso's abdominal aorta which occlusion was shown on the arteriogram performed on plaintiff on May 4, 1984. Thus, although Alfonso's diabetes may indeed have contributed to his vascular disease, he was informed that the sooner his *immediate* problem was attended to, the greater the chance for a successful outcome. Marian Dockery testified, in fact, that the decision to transfer Alfonso to Marshfield after four days in the defendants' care in May was made by Dr. Pierre-Jerome because the doctor "felt it was necessary that [Alfonso] get attention as soon as possible."

I believe there was a concurrence here of both the knowledge of the physical problem and the possibility that someone was at fault for its existence. I emphasize that plaintiffs need not actually have known of the defendants' negligent conduct or the existence of a cause of action in order to trigger the running of the statute. (*People ex rel. Skinner v. Graham* (1988), 170 Ill. App. 3d 417, 429-30, referring, *inter alia*, to *Knox*, 88 Ill. 2d at 416.) They were, however, under an obligation as of at least May 11, 1984, "to inquire further to determine whether an actionable wrong was committed." *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 171.

For the reasons above, I conclude the court was correct in granting the defendants summary judgment where the undisputed facts presented by the record below admit of only one conclusion: that the plaintiffs knew or reasonably should have known both of their injury and its wrongful causation as of May 11, 1984. The judgment of the circuit court of Lake County should be affirmed. The majority's decision to reverse for further proceedings—although an understandably empathetic application of the discovery rule in light of Alfonso's tragic losses—nonetheless injudiciously softens the necessarily rigid perimetry of the statute of limitations, and, therefore, I dissent.